ADMINISTRATORS OF GARDNER G. SMITH AND OTHERS *v.* THE ADMINISTRATORS OF JONATHAN WAINWRIGHT.

[Decided at the Circuit Session, June, 1852.]

[IN CHANCERY.]

*Bill in Equity. Equitable Jurisdiction. Set-off. Bond. Penalty. Damages. Practice in Equity.*

The decease of a party an obligor in a bond, and also the holder of notes given by the obligees in the same bond for the same consideration upon which the bond was given, and the mere representation of his insolvency, his estate being con-

Adm'rs of Smith et al. *v.* Adm'rs of Wainwright.

fessedly solvent, is no reason why a court of equity should interfere in favor of the obligees, and decide that the amount of the notes should be set off against the sum due on the bond, and render a decree in favor of the obligees for the balance, if any. But if the obligees in the bond, being the makers of the notes, are insolvent, a court of equity will interfere in favor of sureties who signed the notes upon the security of the bond, and will decree a set-off of the amount due on the notes against what was due on the bond. The consideration that the nominal parties to the contracts are not strictly mutual, is not a valid objection to decreeing a set-off in equity, if the real parties upon whom the burden is ultimately to fall, are the same.

Where S. and others bought of W. his interest in, and good-will of, the manufacturing and sale of certain articles, within a certain district, and gave notes to the amount of $8000 therefor, and W. at the same time executed to S. and the others a bond " in the penal sum of ten thousand dollars," conditioned to be void " if the said W. shall hereafter wholly refrain from manufacturing and vending," &c., and a breach of said condition by W. was proved; *held*, that under the cir cumstances of the case, the sum so named in the bond was a penalty, and not liquidated damages.

The refusal of the chancellor in the court below to allow a party to file a supplemental bill before the original one comes to a hearing, is not a final decree, from which in the first instance, an appeal lies; nor is it strictly revisable in the superior court, being a matter of discretion.

But where such refusal proceeds upon special grounds, which are shown to have been misapprehended, the party, after correcting this misapprehension, will be permitted to renew his application.

Where a bond is executed to three persons jointly;—their assigns, administrators, &c., not being named in the bond,— their interests being also joint as purchasers of the business of the obligor of the bond, and the nature of the covenants showed that they were not founded upon any personal confidence in the three persons to whom the bond was executed, and where both parties expected the bond to enure for the benefit of the business sold out, and where the obligor had repeatedly assented to his liability after a change in the parties to whom the bond was executed, a court of equity will hold the obligor liable on his bond, not only for damages accruing from breaches thereof while the original parties to the bond remained unchanged, but for those from breaches after the change of parties.

APPEAL from chancery. The facts of the case sufficiently appear in the opinion of the court.

*B. H. Smalley* and *A. O. Aldis* for the orators.

*E. D. Barber* and *J. & J. G. Smith* for the defendants.

The opinion of the court was delivered by

REDFIELD, J. This bill is brought by Gardner G. Smith, Seth P. Eastman, Abel Houghton, John Smith, Henry Adams, and Francis J. Houghton. The bond, upon which the orator's claim is predicated, was executed to Gardner G. Smith, Seth P. Eastman, and Horace B. Foster, on the 9th day of June, 1841, to secure to them Wainwright's good will in the sale and manufacture of iron castings, stove pipe, tin ware, &c., in the counties of Franklin and Grand Isle, and a defined portion of the Province of Canada, and to exclude Wainwright from all manufacture or trade in such article within the aforesaid district. Wainwright's bond is in the penal sum of ten thousand dollars, conditioned to be void " if the said W. shall hereafter wholly refrain from manufacturing or vending," &c.

A good deal is said in the bill, which might look like an inducement to a charge of fraud in Wainwright in obtaining the sale, by representing his " good will" in this trade as being of more value than it was. But taking the bill altogether, it seems, that these allegations are introduced rather to show the high value placed upon this " good will" by the parties, and that it was considered a chief inducement towards the trade upon the part of Smith and others.

The bill then charges, that the ten thousand dollars was understood and agreed damages between the parties, to become an absolute debt due the obligees, upon the slightest failure to perform on the part of Wainwright.

The bill then prays, that the notes given by the obligees for the purchase of Wainwright's stock in the trade and the good will of the business, amounting originally to some eight thousand dollars, a portion of which has been paid, may be surrendered and applied towards the sum due upon the bond, and the estate of Wainwright be decreed to pay the balance to those entitled to receive it, being a portion of the orators.

The breach alledged in the bill, is the carrying on the business of vending, within the prohibited limits, both by Wainwright in his lifetime, and by the administrators, in that capacity, since his de-. cease. But it is not claimed, that there is any evidence of any act of sale by the administrators in the prohibited district. That is all which requires to be said upon that part of the case.

At the bringing of the bill, and before the death of Wainwright,

the partnership of the obligees, after being twice changed, was finally dissolved in August, 1844, and Gardner G. Smith became sole proprietor in the business; and he, or his estate, has been solely interested in it, since that time.   Foster, one of the original purchasers and obligees in the bond, sold out to his associates, September 27, 1841; Francis J. Houghton bought into the concern, as from the beginning, as is alledged in the bill, 26th August, 1842, and Houghton and Eastman finally sold out to Smith, in January, 1844, and the partnership was closed up and dissolved in August, 1844.

Henry Adams, John Smith and Abel Houghton have at different times, signed the notes to Wainwright, as sureties, either for the original purchasers, or for those who subsequently came into the concern.

The only reasons urged in the bill, for applying to a court of equity, are the decease of Wainwright, and his estate being represented insolvent, and the allegation, that the sureties signed in faith of Wainwright's faithfully performing the condition of his bond, and that without that they would not have signed without security.

This last reason does not seem to us to amount to much any way. In the first place there is no proof whatever, and no reasonable probability, that these sureties made a principal reliance upon Wainwright's bond, as a leading motive for assuming the obligation of suretyship.   It doubtless formed an ingredient, (operating more or less upon the different persons,) constituting, with numerous other things, the consideration, or compound motive force, inducing them to become sureties.   But there remain two serious objections to the interference of a court of equity, upon this ground, even if it were an acknowledged fact that this bond formed the chief motive to the sureties to become such : 1. There is an obvious want of privity, in regard to this bond, between the sureties and Wainwright, which would, under ordinary circumstances, render it unreasonable to require Wainwright to litigate the matter with parties so remotely related to him in the original transaction; and 2. There is on the face of the thing, an apparent adequate remedy upon the bond itself, in a court of law, which would induce a court of equity, the more to hesitate, in extending its functions to embrace matters not obviously and primarily within its acknowledged jurisdiction.

Adm'rs of Smith et al. *v.* Adm'rs of Wainwright.

The only remaining ground of equitable interference, stated in the bill, is the decease of Wainwright and the representation of insolvency. On a motion for leave to file a bill, in the nature of a supplemental bill, before the court of chancery, it was ruled by that court that the facts proposed to be added, viz., the insolvency of the principal signers of the notes, and upon whom the primary obligation of payment rested, was not important to the plaintiff's case. So that if this court deem those facts important, they are to be taken as virtually in the case.

Whatever is said in the case, then, in regard to Wainwright's representations to induce the trade, being laid aside, as not in themselves amounting to any distinct and tangible fraud; and secondly, as being virtually merged in, and superseded by, the bond which was executed by Wainwright, and above all, as forming no distinct ground upon which relief is claimed in the bill; we have remaining, the decease and representation of insolvency of Wainwright, and the decease and insolvency of Gardner G. Smith, upon whom, in equity, the ultimate primary obligation to make payment of these notes rests, and possibly of some other of the original principals, who have now become sureties, for the estate of G. G. Smith, although, as between themselves and their sureties, they must still stand as principals. And we must regard the sole object of the bill to be to obtain a set-off of whatever sum is due upon the notes against the sum due upon the bond, and a decree for the balance. For although the bill contains the general prayer for relief, it points to no other relief but a set-off, and there is nothing in the case showing any ground or pretence for any other relief. To examine the case in this view :—

1. This set-off is claimed upon the sole ground, that the ten thousand dollars named in the bond as the "penal sum," are in fact liquidated damages, to become due to the obligees absolutely, and at once, upon the slightest breach of the condition of the bond. This is the sole and exclusive basis upon which the offset is prayed. It seems in the outset, not to have been supposed, that an offset would be likely to be decreed of a mere unliquidated sum in damages, until it should become liquidated by the verdict of a jury, or in some other mode, known to the courts of common law, or agreed by the parties. We infer that this was the view taken of the case by the counsel of the orators at the

time of framing their case, because the bill does not even present the alternative of the court regarding the damages as unliquidated, except as it may be regarded as included probably under the general prayer for relief. And it seems to be well settled, at law, that if the claim rests in mere unliquidated damages, it cannot be set off, but a sum agreed, as liquidated damages, may. Chitty on Contracts, 844, and cases cited in note; *Gillett* v. *Mawman,* 1 Taunt. 137.

2. Upon the question, whether the ten thousand dollars named in the body of the bond are to be regarded as liquidated damages, or in the nature of a penalty, the cases may not be found altogether consistent with each other. But it seems to us that there can be no reasonable ground of doubt as to this particular case. It is expressly declared to be a penalty in the contract itself, which, although not conclusive altogether, seems to be regarded as nearly so, in one view, *i. e.* where the sum is declared to be a penalty; although the converse does not always hold equally, when the sum is declared to be agreed damages. But where the sum stipulated is expressly denominated a penalty, or a penal sum, I find no case where it has been held liquidated damages, or where any doubt has been entertained upon the subject, except as between landlord and tenant. *Jones* v. *Green,* 3 Y. & J. 304. The case of *Farrant* v. *Olmins,* 3 B. & Ald. 692, cited by plaintiff's counsel, is of this character; and so also, what is said by Comyn, in his Landlord and Tenant, 324, 325, also referred to by plaintiff's counsel. The only remaining case, to which they have referred us, in support of their claim to treat the ten thousand dollars named in the bond of the intestate, as liquidated damages, is *Pierce* v. *Fuller,* 8 Mass. 223. This case in some respects, favors the plaintiffs' claim, inasmuch as it was an agreement to refrain from opposition to plaintiffs' business. But the sum fixed there, was of a character to show that the parties had pared it down to stipulated damages, being two hundred and *ninety* dollars, if defendant should run a stage on a particular road.

There are some other cases, not referred to in the argument, which go to show that the courts in this country and in England, incline to treat these contracts for the sale of the good will of a particular business, or an agreement to refrain from the exercise of a given business, in a specified district, as fixing the quantum

of the damages to be recovered for breach of the contract, where the terms made use of by the parties will reasonably bear that construction. *Dakin* v. *Williams*, 17 Wendell, 447; and *Williams* v. *Dakin*, 22 Ibid. 201, is where the plaintiff gave three thousand dollars for the good will of a newspaper establishment, and five hundred dollars for the type and printing apparatus, and took a bond from the venders, not to publish or aid in publishing a rival paper, and upon failure, to pay three thousand dollars. This was very justly held to be liquidated damages.

But in the case before us, the property sold, seems to have been fixed at what was esteemed its fair valuation, and we do not learn that any thing specific was added for the good will. And the whole sum paid was only about eight thousand dollars, and the bond is ten thousand dollars. And while we must at once perceive that the bond was an important consideration in inducing the bargain, without which one could scarcely be induced to buy the remnant of a long trade at any price, and that it might have very considerably increased the price paid, still there is no pretence that the parties could have considered the sum of ten thousand dollars, as liquidated damages for a single violation of the obligation, or even for a continued violation thereof. And in fixing a construction upon the contracts of the parties, we are bound to do it with reference to the surrounding circumstances.

The recent case of *Sainter* v. *Ferguson*, 7 Man. Grang. & Scott, 716, 62 Eng. Com. Law R. 716, where the defendant agreed not to practice as a surgeon, under a penalty of five hundred pounds, and the court held the amount liquidated damages, is the strongest case I have found in favor of the plaintiffs. But that case, in my opinion, bears no just analogy to the present in its facts and circumstances. And it is there considered, by Chief Justice WILD, a question of construction for the court, dependent upon the facts and circumstances which appear in, and surround the case. The point of the damages was very little considered. The current of the cases, early and late, where the subject has been much considered by the courts, undoubtedly is :—

1. That where there is any reasonable doubt upon the face of the instrument, how the parties intended it, it shall be construed as a penalty merely. *Davis* v. *Penton*, 6 B. & C. 216; 13 Eng. C. L. R. 147. Opinion of Chief Justice BEST, in *Crisdee* v. *Bol-*

*ton*, 3 C. & P. 240, 14 C. L. R. 286. This was an agreement for the sale of a public house, and an agreement not to be engaged in the business of a publican, under the penalty of five hundred pounds, "the same to be recovered as, and for, liquidated damages." This was held at *Nisi Prius* to be liquidated damages, and the jury having been asked to pass upon the question of actual damages, and having assessed them at the same sum, the full bench refused to grant the rule to show cause why a new trial should not be had; the jury having assessed the actual damages at the same sum as the penalty. The case of *Shute* v. *Taylor*, 5 Met. R. 61, seems to have gone upon the general ground, that in doubtful cases the courts should construe the sum as a penalty.

2. It must be regarded as a settled general rule upon this subject, that where the sum is named as a penalty, in the contract, and no stipulation that it shall be regarded as liquidated damages, it can only be regarded as a penalty. Chitty on Con. 867, and note *n. Taylor* v. *Sandiford*, 7 Wheaton, R. 13; 5 Pet. Cond. R. 210.

The language of Chief Justice Marshall, in the last case applies with great force to the present one. "In general, a sum of "money in gross, to be paid for the non-performance of an agree-"ment, is considered as a penalty. It will not, of course, be con-"sidered as liquidated damages; it will be incumbent on the par-"ty who claims them as such, to show that they were so consid-"ered by the contracting parties." "Much stronger is the infer-"ence in favor of its being a penalty, when it is expressly reserved "as one." "The parties themselves denominate it a penalty; and "it would require very strong evidence to authorize the court to "say that their own words do not express their own intention." We could add nothing more as applicable to the present case, and the facts and circumstances require or justify nothing less.

Notwithstanding this case contains some of those features which have been sometimes seized hold of, for the purpose of justifying an opinion that the sum should be regarded as liquidated damages, viz., that it is a contract for the good will of a trade or business; that it is for the abstaining from doing an act, and one which one is in no likelihood of doing involuntarily or through inadvertence, and that the breach of the bond consists of a single act, or two at most; still it seems to us that it is little short of ab-

surdity to say, that under the circumstances attending the giving of this bond, and the terms used, it could have been intended that this sum of ten thousand dollars, which in terms is denominated by the parties, a penal sum, is nevertheless no penal sum, but liquidated damages, and was so intended by the parties. The case of *Boys* v. *Ancell*, 5 Bing. N. C. 390, and *Kemble* v. *Farren*, 6 Bingham 141, strongly favor this view. In the latter case, the contract of the parties was explicit that the sum should be "liquidated and ascertained damages, and not a penalty or penal sum, or in the nature thereof." And still the court held it a penalty and nothing else. We conclude, then, that this sum of ten thousand dollars, named in the bond as the "penal sum," must be so regarded by this court. The language of the court in the last case, shows how much the courts incline to regard all doubtful cases of this class, as penalties, and especially so, when the contract so declares.

This determination must be regarded, we think, as disposing of the ground upon which the plaintiff placed chief reliance at the time of bringing the bill.

But it is insisted that if the principals are entitled to a sum in damages, which is unliquidated, a court of equity will, under peculiar circumstances, entertain a bill for an offset, and liquidate the matter, or allow the party to proceed at law, and obtain a liquidation, and then decree an offset. This has, no doubt, been done, under circumstances of peculiar equity. That was expressly decided by this court, *Nims* v. *Rood*, 11 Vt. Rep. 96, and also in *Foot* v. *Ketchum*, 15 Ib. 258. The usual course in such cases is to refer the party to a court of law, as was done in the cases last cited. Anything short of this would be regarded as offering a temptation to suitors, under circumstances, to withdraw matters from the common law courts, in order to have them litigated in the court of chancery, to the prejudice of the legitimate suitors in that court, and the burden and embarrassment of that court with matters not appropriately belonging to them. And it might sometimes be regarded as giving the orator an unequal option, in selecting the forum for trial. These considerations, and the farther one, that if there is any claim for damages growing out of the breach of this bond, it is a matter resting altogether *in pais*, depending upon a multiplicity of evidence, and that very conflicting,

XXIV.     8

and so entirely appropriate for the consideration of a jury who can have the witnesses before them. All this would induce us, if there is any claim of this kind upon which, if the principals should prevail, there would be an equity in the orators, or any of them, in claiming to have a set-off against these notes, to refer the liquidator of the matter, to the tribunal having the common law jurisdiction of the claim.

We must inquire, then, whether if such a claim should be established at law, there is any sufficient ground made out for the interference of a court of equity, to decree a set-off. The consideration that the nominal parties to the contracts are not strictly mutual, is not now regarded as any valid objection to decreeing a set-off in equity, if the real parties upon whom the burden is ultimately to fall, are the same. The subject is sufficiently discussed in *Downer* v. *Dana,* 17 Vt. R. 518, and in *Blake* v. *Langdon,* 19 Ib. 485. I should not now desire to add to what is there said. These cases show that if the plaintiff here made out a case of the utter insolvency of one or more of the principals in these notes, the sureties would have an equity to compel the application of any sums due the principals from Wainwright's estate, before they were compelled to make any payment out of their own funds. So too, if the principals were solvent, and Wainwright's estate insolvent, they might compel the application of any sum due them from Wainwright's estate, notwithstanding the notes were signed by the other parties, as mere sureties.

But it seems to us that the decease of Wainwright, and the mere representation of insolvency, when the estate is in fact confessedly abundantly solvent, is no sufficient reason, in itself alone, why a court of equity should interfere to decree a set-off. It is, in fact, oftentimes a serious inconvenience, and sometimes, no doubt, attended with serious loss, for a party to be compelled to advance a large sum of money, when a portion or the whole of it is ultimately to come to him from the very same party now seeking to enforce him to pay money, which, in moral justice and equity, he is not justified in doing. But in legal equity such inconvenience is not regarded, or attempted to be redressed. It is presumed that where there is an ultimate solvency, the time of payment, if protracted by the mere delay of judicial administration, is not essential. There is in many respects, an analogy between

this case and that of bankruptcy, but there are many important differences. And one is, that what is supposed to be the extreme exception in the one case, *i. e.* that the funds or assets will pay all the debts, is of frequent, if not the more general occurrence in the other case. So that what .is in one case the exception, may be regarded as the rule in the other. And this, of itself, forms the sufficient reason why what is regarded as sufficient ground of equitable interference in the one case, should find no ground whatever to stand upon in the other.

And the other ground, to wit, the insolvency of the principals, it was said in argument, and is true, perhaps, is not in the case. But it was offered to be put in by way of supplemental bill. And the chancellor refused to allow the party to file any bill in the nature of a supplemental bill, with a view to remedy this defect, upon the ground that such facts were immaterial to the plaintiff's case. We now consider them the only ground upon which this case can be made to stand at all. If there were no other insuperable objection or obstacle in the plaintiff's progress, (which we shall soon consider,) the court of chancery, no doubt, should have allowed him to file his supplemental bill, or one in the nature of a supplemental bill, as was done in the case of *Gillett* v. *Hall,* 13 Conn. R. 426, which in this respect was similar to the case before the court. In that case the supplemental bill was filed during the pendency of the original bill, and before the hearing. And the additional facts thus brought into the case were regarded as essential to the jurisdiction of the court of Chancery.

If a case of the insolvency, in whole or in part, of the principal in the notes, or the party ultimately liable in equity, to pay them, was made out; and if also it were shown that this principal, either in his own name or the name of others, had a claim against the creditor, which was not, at law, under the control of the other parties to the notes; and especially in the case of the death of this principal, and a consequent liability to have this equitable offset absorbed in his estate, and distributed among his general creditors, we should consider that there had arisen a complication of equities, and counter equities, to the adjustment of which, the equitable powers of the court of probate were wholly inadequate. And so, within the rule laid down in *Adams* v. *Adams,* 22 Vt. R. 50, the court of chancery would have jurisdiction in aid of the probate court.

And in a case like the¹ one supposed, there is obviously no adequate remedy at law, as we have before intimated.

Some other objections are made to the plaintiff's claim, in a legal point of view, which we must briefly notice, to prevent misapprehension.

We do not suppose that the refusal of the chancellor to allow the party to file⁹ a supplemental bill, or one of that kind, before the original bill comes to a hearing, is either a final decree from which, in the first instance, an appeal lies, or that it is a decision which is strictly revisable in this court, being matter of discretion, But that refusal having proceeded, upon special grounds, we should, of course, give the party an opportunity to renew his application, after correcting this misapprehension of the chancellor, if this were the only difficulty in the plaintiff's case. If by this amendment the plaintiff makes a new case, and thus ultimately obtains a decree upon other grounds of equity than any stated in his bill, this would no doubt, form an important consideration, in fixing the terms of the amendment, or in the final adjustment of the costs, which would scarcely escape the notice of the court of chancery.

Whether the general frame of this bill is of a character to enable the party to obtain relief upon this latter ground, is certainly not free from doubt. It certainly is not the usual form of a bill to reach such an object. The usual course is, no doubt, for the sureties to bring the bill in their own names, as orators, joining the creditor and the insolvent principals, as defendants, which would present the parties in their more natural and true position before the court.

The only remaining objection urged by the defendants, which seems to us to afford serious obstacles to the recovery, is the change in the interest of those who bought out the concern of Wainwright, and to whom the bond was executed.

It was said, by the closing counsel for the plaintiff, that this was regarded by them, as one invincible obstacle to their recovery at law ; and might therefore be regarded as a proper ground of application to a court of equity, for relief in the premises. There may possibly be a good deal of soundness in this proposition. As a general rule, I apprehend, where it becomes necessary to apply to a court of equity to reform a contract, and the equity court do

so reform the contract, they also retain the case and decree relief. But this is by no means a uniform rule. If the matter is peculiarly appropriate for the consideration of a jury, as in the present case, the party is handed over to the common law courts for his redress, after having his contract set right, or the question of fact is sent to the courts of law to be tried by the jury.

But the objection to the jurisdiction being made to rest upon this ground here is, that the case is not one which a court of equity would be likely to retain upon this ground alone, it being so peculiarly fit for the consideration of a jury; and further, this ground of relief is not alluded to in the most remote sense, either in the original bill, or the proposed supplement. And we might no doubt, with perfect propriety, here dismiss this question. But as this is a question which the plaintiff must encounter upon the very threshold, if he elects to proceed with his case, we have deemed it important that it should now be disposed of.

The bond is in terms a joint obligation to Smith, Eastman and Foster, and not to their assigns, successors, or to administrators or executors even. The bond then being executed to the three jointly, and their interest at the time, being confessedly joint, the action must undoubtedly be in the joint names of the three, so long as all live. But it is claimed by the defendants' counsel, that a recovery could only be had for a breach during the time of the business being carried on by them jointly, *i. e.* between the 9th day of June and the 27th day of September, 1841. And from the examination which we have been able to make, it seems to us that in strictness of law, such only is the extent of Wainwright's obligation, *i. e.* to pay what damages should accrue to the three jointly, from his manufacturing or vending the prescribed articles, within the prohibited district. Nothing else is to be gathered from the terms of the bond, and nothing else probably was within the express contemplation of the parties at the time. *Myers* v. *Edge*, 7 T. R. 250, is a clear case to show that contracts of indemnity or bills of credit, addressed to a partnership, cannot be enforced after one of the partners have withdrawn from the concern, or not for credits given after such withdrawal. The principle of this case is of daily application and enforcement in every commercial state, where the common law of England prevails. In the case of *Dance et al.* v. *Girdler et al.*, 4 B. & P. 34, a bond was given to A., B.

and C., and others, payable to their successors, for the faithful services of their collector. This society was afterwards incorporated, and the collector made default after such incorporation, and the obligors were held not liable. In *Barker* v. *Parker*, 1 T. R. 287, a bond to the obligee and his executors, for the faithfulness of a clerk, was held not to make the obligor liable for money received by the clerk and not accounted for, while the business was carried on by the executor. *Strange et al.* v. *Lee*, 3 East. 484, is a strong case in favor of restricting the obligation to the time of the continuance of the joint interest of the obligees. But it is not to be understood, that these cases go so far, as to hold that, a bond executed to one, and his successors and partners, is not to be regarded as binding to the full extent of the terms used, and the intention of the parties. That is expressly declared by Lord Mansfield, in *Barclay* v. *Lucas*, 1 T. R. 291, in note, and again reported by Ellenborough, C. J., in *Strange* v. *Lee*. The contrary would certainly involve a very glaring absurdity. But a court of law would of course confine the parties to the contract, and not enlarge its obligation, by construction or implication. And a court of equity must do the same, unless applied to to reform the bond, and it would not reform a contract of this character, except upon the most satisfactory grounds.

But the present case seems to us to rest upon somewhat peculiar grounds, in regard to the propriety of affording relief in favor of those who should carry on the business, although not the same persons named in the bond.

1. It is of a negative character, not to do, or that any other shall do, a particular thing ; but a personal undertaking to refrain from doing it. So that this cannot in any sense be said to be an undertaking founded upon the personal confidence of the particular partners to whom it was executed. If he refrained from the business, it would be indifferent to him to whom the business was left, except so far as his regard for the public good was concerned, and this is not, ordinarily, much of an ingredient in the consideration of contracts.

2. There can be no reasonable doubt both parties expected this bond to enure for the benefit of the business sold out, so long at least, as it should be continued by the same persons, either jointly or severally, or associated with others. This is sufficiently evi-

denced by the conduct of both. The obligor repeatedly assenting, and showing by his conduct very obviously his belief, that he was liable upon his bond, as well after as before the change in the partners. And the obligees changing their firm from time to time, without reserve, and still very obviously relying upon the perfect validity of the bond, as a contract binding upon Wainwright.

3. The good will of Wainwright's business was no doubt an important consideration with the obligees, for which they considered that they paid a very considerable sum, and they would not be likely to do an act readily, by which it would become forfeited. Wainwright, too, esteemed this important to himself, and that he was receiving very considerable for it, and after he resumed the business again, as he did in other parts of the State, he was no doubt exceedingly anxious to recover the lost field of trade, which we have no reason to doubt he would immediately have done, had he supposed the obligation of the bond had ceased, by reason of the change in the partners, of which he was fully aware.

Under these circumstances it seems to us, that it would be a virtual fraud upon the obligees to allow Wainwright to escape from the obligation of the bond. Upon this ground alone, if they made proper application to the Court of Chancery to have the bond reformed in this particular, we entertain no doubt it would be the duty of that court to make such a decree upon the present state of the evidence.

1. The result of all which, is that the plaintiff's case if he elect to proceed with it, must rest mainly, for its choice to be retained in the Court of Chancery, upon the equitable rights of the sureties, growing out of the decease and insolvency of the principals.

2. To bring this into the case, it is requisite to have the case remanded to the Court of Chancery, and there obtain leave, in the discretion of the chancellor, to file a bill in the nature of a supplemental bill.

3. In this supplemental bill it will be necessary also to include an application to the Court of Chancery to reform the bond so as to extend it to the obligees and their associates until the decease of Smith, or more properly, until the decease of Wainwright.

4. The party must then obtain his verdict in the suit at law, the rule there entered for nonsuit having been already vacated by the chancellor.

The decree of the chancellor is reversed, and the case remanded to the Court of Chancery, to be there disposed of, in accordance with the rules here decided, and others, which may become applicable to the same, in its progress and final determination, in conformity to the principles of equity law.