Pierce *v.* Daniels et al.

---

DAVID PIERCE *v.* REUBEN DANIELS, ABRAHAM STEARNS, ROYAL BLAKE AND THOMAS C. DANIELS.

[IN CHANCERY.]

*Partners and Partnership.   Agent.*

If one, or more, of the members of a firm, divert the funds of the firm to other uses, such partner is liable, in making up the account, to be charged with all the detriment thus suffered by the firm.

And if one of the partners act as general agent, he is liable in some form for what the firm suffers by his unfaithfulness.

And upon the failure of the firm, if the agent, or the partners bid in the partnership effects, at a ruinous discount, from their true value, and especially, if this is done by collusion, they may be made to account for the avails.

The impropriety of transferring complex matter of account upon this court, without a *bona fide* trial and judgment in the court below, considered.

APPEAL from the court of chancery.

December Term, 1852, Chancellor Pierpoint decreed in substance, that the exceptions to receivers report be overruled and report accepted and confirmed.   That exceptions to the master's report be overruled and master's report accepted, and the accounts settled accordingly.

That the orator's bill, except so much as relates to the receiver and accounting, be dismissed with costs, and that the costs of accounting be equally divided between the partners. The facts in this case fully appear in the opinion of the court.

*D. Pierce* for orator.

*Washburn & Marsh* for defendants.

The case was argued at the March Term, 1853, and held under advisement until the present circuit session, when the following re sult of the examination of the case, was stated by

REDFIELD, Ch. J. The bill in this case states, that in January, 1831, the orator, and Abraham Stearns, and Reuben Daniels, of Woodstock, Royal Blake, of Brandon, and Thomas C. Daniels, of Worcester, Massachusetts, entered into copartnership, in the business of making and selling machinery for manufacturing woolens, and other machinery. The capital stock furnished equally, by the partners, and paid in, was $7500. Profits and loss to be shared equally. Reuben Daniels, employed by the company, as sole agent and director of the business, was to devote his entire time to the business, and to receive $2 50, per day, being a skillful, practical machinist. The agent entered upon his duties and received the capital stock, and has had the entire management and control of the business, and kept all the books and papers, and all the property of the concern, and has rendered no account of the concern, although large profits have accrued to the concern.

In 1840, Daniels and Stearns, without the consent of the orator, took a large portion of the capital stock out of the concern, and invested it, on their own account, in other business, viz : Ragwool and ragwool cloth manufacture, thereby causing the failure of the plaintiffs partnership—and great loss and costs, in suits, sale of property at sheriff's sale, and in various other modes.

2. That in 1842, Stearns and Daniels failed in business and became desirous of compounding with their creditors, at a low rate and to this end gave out and caused it to be believed, that the partnership first named of R. Daniels & Co. was of little or no value, and insolvent, knowing the contrary to be true. That to induce all their creditors to compound, they suffered suits upon the debts

of R. Daniels & Co., and great costs and loss in sales at auction, &c., by which the business of R. Daniels & Co. was wholly suspended.

3. That after Stearns and Daniels had induced the creditors of the ragwool concern to compound at twenty-five cents on the dollar, on condition all the creditors would so do, they applied to the orator to consent, that the debt due R. Daniels & Co., should be compounded, at that rate, which orator declined to consent to, and then Daniels claimed, that as general agent, or partner, he had the right to bind the partnership, by consenting to such a compromise, and that he would do it, to prevent which, the plaintiff, by publication, dissolved the partnership of R. Daniels & Co., March 1, 1843.

4. That Stearns and Daniels, instead of paying the company of R. Daniels & Co., what they owed them, and by applying the property of R. Daniels & Co., to the payment of their debts, they suffered and procured suits to be brought against R. Daniels & Co., and their property to be sold on execution, and bid it in themselves, below its full value and retain it, or have sold it, at higher prices.

5. About the year 1833, R. Daniels & Co. were indebted to Stearns and Blake, being Abraham Stearns and Royal Blake, in the sum of $5000, and executed a note, signed by each partner of R. Daniels & Co., and made payable to the Bank of Woodstock, for that amount. This note was never discounted, but pretended to be sold to John Stearns of Boston, the brother of Abraham Stearns, and the real estate of R. Daniels & Co., to a much greater amount, than that of the note, mortgaged to John Stearns, to secure the payment of the note. Comprising the shop, and water power of the company. That the debt was always Abraham Stearns', and under his control, and was in fact paid by Daniels, but not endorsed.

And in 1845, Abraham Stearns and Daniels, to coerce the orator, to relinquish his interest in the real estate, caused a suit to be brought on this note, and suffered a judgment to be recovered upon it, for $6020, and $13 36 costs—and enforced the collection of $610, but collected no portion of it from any other partner, the orator being at the time ignorant that the note had been paid.

6. That said Reuben, while in the business of said company,

did not devote his time and talents and skill to its interests, but to the invention of machinery and the raising of silk and mulberry trees, and from such neglect of said Daniels, the concern suffered great loss, and especially a debt due from John A. Pratt, of $730 41, and a note against the Village Falls Manufacturing Co. of $435. And Daniels delivered a lathe to one Bullard, conditioned to become his when paid for, and then suffered him to go out of the country, *without obtaining* either the lathe, or pay for it.

7. Daniels has hitherto retained the entire control of the assets of the partnership, giving no account thereof. The orator has often applied for an account, but could obtain none, and the other partners would not join in any suit! The charging part of the bill seems to be pretty much a reiteration of the stating part, except that it is charged, that all the partners except the orator, are confederate with Daniels and Stearns, in their efforts to injure and destroy the orator's interest in the partnership of R. Daniels & Co.

1. The prayer of the bill is, that an account be taken of the loss sustained, by reason of the unfaithfulness of R. Daniels, as agent, that he be decreed to pay the amount.

2. That it be ascertained to what amount the *partnership*, and *especially the orator*, have suffered loss, by the fraudulent conduct of Stearns and Daniels, in injuring the credit of the partnership, and suffering its property to be sold at auction, for their own advantage.

3. That an account be taken of all the use of the property, and of the real estate and their patent rights since the dissolution. This seems to have no connexion with the stating part of the bill, and none with the charging part except that it is said, in answer to Daniels' pretences of letting the property at a low rent, that this was done to favor Daniels.

4. A general account and settlement of the concerns of the copartnership, and the amount due from and to each partner be found and decreed.

The answers of Stearns, Daniels and Blake, admit that on the 17th day of May, 1830, the orator and defendants formed a copartnership, called the Woodstock Engine Co., for the manufacturing of rotary fire engines and pumps, &c. That in February, 1831, they took the name of R. Daniels & Co., and continued to do business

till December, 1842, when the concern became insolvent, and have done no business since, except to close up.

Admit the formation of the partnership and payment of capital stock, as alleged. The compensation of the agent $730 33 for his whole time, or in that proportion, when employed in the business of the firm.

January, 1831, Reuben Daniels and Royal Blake appointed agents to contract for selling machinery. They admit that Reuben Daniels was the general agent of the company, but deny that he was thereby bound to devote his entire time to the business of this concern.

That Daniels continued the general agent of the concern to the time of its failure, and since July, 1844, he has had the management of its settlement by virtue of a special power signed by defendants.

Deny that it was the duty of Daniels to keep the accounts. They were kept under the direction of Blake, till the 25th day of March, 1833, and then by vote of the Company, Moses Fairbanks was appointed clerk of the Company, who continued to keep the books of the Company, till it finally suspended business.

Alledge that the capital stock was not paid in money, but $1100, in the property of the old firm, which proved worthless to the new Company. And $2500, of the capital stock was made up by charging $500, to each member upon the books of the Company.

Stearns and Blake kept the books and papers of the Company until the appointment of a clerk, and then he kept them till the power of attorney given Daniels to settle the concern in 1844.

On the 13th day of October, 1847, all the property belonging to the concern was disposed of, and distributed to the partners. The unsaleable property to a small amount and the " desperate" demands left undivided. These demands were agreed to be left with Joseph Darling, and the undivided property, not amounting to $20, in all, was left on the premises.

On the 13th day of January 1840, Stearns and Daniels and three others, not of plaintiff's partnership, formed a copartnership by name of F. K. Nichols & Co., for the manufacturing of satinets, and the style changed on the second day of July, 1841, to Abraham Stearns & Co., so far as the business at Troy is concerned.

Deny that any portion of the funds of R. Daniels & Co., were withdrawn or diverted to this new Company ; but admit that accommodations, from one firm to the other by way of loans for short times and small sums, was common.

The account with the new firm was kept with F. K. Nichols & Co., at the Hartford, Vermont, branch, and Abraham Stearns & Co., Troy, New York, branch.

The firm of Daniels' & Co. sold machinery to a large amount to both branches of the new firm. The balance always small and finally paid.

Abraham Stearns & Co. had machinery of R. Daniels & Co., from time to time, to the value of $2530 30, and before this, R. Daniels & Co. were indebted to Porter & Co., of Springfield, Vermont, to more than $5000. Porter & Co. attached the property of R. Daniels & Co., and Nathan T. Churchill receipted it, at their request. A. Stearns & Co. executed a note of $1000, about what was supposed due to R. Daniels & Co., and this was given to Churchill, as his indemnity for signing the receipt. This was done in the presence and by consent of plaintiff. A Stearns & Co. subsequently executed another $1000 note, which went in the same way. A. Stearns & Co. paid these two notes to Churchill, which went in part payment of the judgments recovered by Porter & Co., and the balance of Stearns & Co.'s indebtedness to R. Daniels & Co., $530 30, was paid, except a discount on account of an imperfection in one of the machines, the last payment and final settlement, April 21, 1844.

The business of A. Stearns & Co, being at first, very profitable, of a sudden, by changes in tariff, became ruinous and they failed and made an assignment, December 2, 1842. This involved the failure of R. Daniels and Stearns, to whose responsibility the creditors of R. Daniels & Co. chiefly looked, and the hands in their employ became dissatisfied with the security for what was due them, and sued and attached the property of the Company. Their other creditors then sued ; upon these attachments and the Porter & Co. attachments, which was the first sale, all the property of the Company, or nearly all, was sold.

John Stearns had a mortgage of the real estate and it was expected he would have to take it, and if so, he would need the tools and machinery, and at the suggestion of Daniels, he was informed

of the time of sale, and employed Joel Eaton to bid for him, and he employed Abraham Stearns & Co. to bid for John Stearns in Eaton's name $334, which was known to orator, at the time, and not objected to, $132 52 was bid off by A. Stearns in the name of Eaton, which eventually went to the benefit of A. Stearns. Daniels bid off by self and O. P. Chandler, $51,25 which was never sold for more. Job Lyman attended the sale and bid off $147, and as the defendants believe, for orator's benefit.

At the second sale, R. Daniels bid off $7 92, and by Darling, $242,01. At this sale, orator bid off for his own benefit $111 80, in the name of Dana Pierce.

Deny all loss from the defendants withholding sums due the partnership, or from instigating suits against the company, or that they procured suits to be brought. Believe the firm of R. Daniels & Co, insolvent in December, 1842, and before and always after.

Deny the omission to collect money. Deny that Daniels asserted that he could or would compound with A. Stearns & Co. at twenty-five cents on the dollar.

Denial of the whole charge, as to the John Stearns debt, and setting forth the detail of facts, and among others the *payment*, by each of his proportion of that debt, the orator paying less than his true rate.

Daniels denies all neglect of the proper duty imposed upon him by his contract, or undertaking with the partnership. Also denies all negligence in collecting debts, and sets forth in detail the disposition of demands named in the bill. Says the Bullard lathe was burned in Bullard's possession and he died insolvent, but the whole debt was collected, discounting interest.

Says he reccipted the property of the sheriff after the attachment and is ready, and has always been, to account for the use, if he has not already done so.

Denies the diversion of funds, or of any intentional injury to orator, and consents to render an account.

*Second Answer.* Deny that they ever represented that the firm of R. Daniels & Co., was insolvent, or that their interest was of no value.

The inventories made to determine the increase of stock, &c., and consequently every thing continued to be inventoried at cost. Rent of real estate paid to Porter & Co., and of personal property

to John Stearns. Denial of all collusion in the attachment and sale of the personal property. This answer is traversed, and by consent, the case is referred to the master, to take the account, between the parties, who made report, which was accepted, by the court and decree accordingly. This whole proceeding, in the court of chancery, except before the master, has been, by consent of all parties. And according to ordinary rules of proceeding, and all reason and good sense, if the parties make up a judgment, for the mere purpose of evading the law, which provides for a *bona fide* trial and judgment, in the court below, and especially, where this is done, as in most such cases, it is, for the relief of the parties, and the result is to throw the entire burden, of digesting a complex matter of account, upon this court, it ought not to receive our full countenance. We had thought sometimes of adopting a rule, that in such cases the judgment shall be affirmed without argument, as was the rule in New York while they had a court of chancery : but choose that the thing should be first understood by the profession. But all will see, that it is transferring the proper business of one court to another, and if allowed, is compelling the appellate court, to try the most complex, and difficult cases under the greatest disadvantages. This is said in regard to matters of fact merely. As to matters of law, it is indifferent to this court whether they have been discussed, and decided, in the court below, or not. They are still the same ; but matters of fact, by examination, and debate, and decision, become simplified and their complexity eliminated, to a great degree. The chances of having a matter of fact correctly determined, in this court, is perhaps not equal to what it is in the court of chancery. We have ordinarily but one full set of copies, of course it can only be examined, by one Judge, and in this court there is not half the leisure, to deliberate, upon complicated matters of fact, which there is in the court of chancery.

1. The law of this case is not very difficult. If one, or more of the firm have diverted the funds to other uses, such partner is liable, in making up the account, to be charged, with all the detriment thus suffered. But this *is a matter of distinct wrong* and fraud, and therefore not to be presumed, or inferred from slight evidence, and especially when, as in the present case, it is unequivocally denied, in the answer.

Pierce *v.* Daniels et al.

2. The unfaithfulness of Daniels, as agent, he is no doubt liable for, in some form, and as a rebate upon his share of the present avails of the partnership property. But that is a matter, in which the other members of the firm are properly plaintiffs, and the fact that they are so far satisfied, with his conduct, as to refuse to join, in any proceedings against him, and that therefore the plaintiff is virtually under the necessity of proving the misconduct of the agent, and the actual collusion of the other partners, and this, in contradiction to the express averments of the defendants, and Daniels answer makes this point in the plaintiff's case, one of considerable difficulty.

3. There is no doubt, that if the agent, or the partners bid in the partnership effects, at a ruinous discount, from their true value, and especially, if this is done, by collusion, they may be made to account for the avails. But in such cases, the chancery law requires, that the party claiming the virtual trust, and the account of the actual sales shall demand it, at the earliest convenient time, after the transaction comes to his knowledge. And if this is not done, the party is regarded, as acquiescing in the sale, and is consequently bound by it. These are all so familiar principles of equity law, as not to require authority.

These three propositions seem to contain all that the plaintiff claims in his bill, under different forms in detail, except the mere account which has not been opposed from the first. To these points then, we have directed our inquiries in the examination of the case.

What is said in the bill of the withholding dues from the firm, and purposely bringing about an attachment, is either confined to Daniels, and so a part of his unfaithfulness, or else to Daniels and Stearns, and so forms a portion of the alleged fraud, between these two men, towards the firm in diverting funds, &c.

The master's report, and that contains all the testimony taken in the case, upon a careful examination, seems to exhibit the usual careful consideration of each demand of the company, and embraces a detailed statement of the history of each particular item of the property of the partnership, with specific reference to each ground of claim made in the bill. As to specific facts, it is certainly not very abundant. It does not implicate Daniels, or any of the defendants, in any unequivocal instance, either of fraud, or abuse. But that

is claimed, as matter of inference, from the particular facts. This we esteem purely matter of fact, and which it is peculiarly the province of a jury, or the masters of the court of chancery to determine in the first instance, before the case is ripe for a decree in the court of chancery. And of course the case should be finished, in the court of chancery, before it could properly come here, by appeal. And we have sometimes sent cases from this court, into the court of chancery, that a matter of unliquidated damages might be tried, in an issue pending, at law, before the final decree of the court of chancery. *Smith's Estate* v. *Wainwright*, 24 Vt. 97.

We do not intend to control, in any sense, the court of chancery in regard to sending issues of fact, to be tried by the jury, in a court of law. If the thing is done, the rules of practice will have to be settled, by the courts of chancery, in some sense, as to the precise form of the issue, and the testimony to be used before the jury. And this involves some labor, and carefulness, and will of course be attended with more effort, and responsibility, than to keep to the old beaten track. And especially, when the parties differ, this is not likely to be done, however desirable it might seem. But the thing is of every day's occurrence almost, in the English chancery, and in many respects has a good deal to recommend it to the favorable consideration of equity courts in this country. It has been long in use in many of the States, with increasing utility and acceptance.

The court of chancery might, as they often do, settle in the first instance the basis of the accounting before the master, or it might refer the whole matter to the master, as is more common, where, as in the present case, the principles of the accounting are not much controverted. But the chief dispute here is in regard to the facts of faithfulness, and honesty, in the performance of a trust, and all this is mixed up with a complicated matter of account, and incapable of being altogether separated from it. But where the specific account is taken, leaving out of view altogether, fraud, or unfaithfulness, or breach of confidence, it must ordinarily be taken for granted that such facts are not found by the master.

But in the present case, the report shows, that the plaintiff objected to any finding by the master upon these points. This in strictness, was equivalent to an abandonment of that portion of plaintiff's claim, and the account being settled, by his consent, in-

XXV.          41

dependent of that, might very properly be regarded, as fully settled. But as it is apparent, the plaintiff regarded this court, as bound to determine all such questions, he did not intend to waive any claim upon those grounds. The account not thus having been fully taken, and having no chancery powers in this court, we cannot finish a matter of accounting, we remand the case to be there fully determined. This being the view taken by the court, as to the disposition of the case, it is not deemed expedient to make any farther suggestions, except such as may tend to aid in the final disposition of the case. In these we shall be brief.

1. It is to be borne in mind, that some difference is to be observed in the degree of watchfulness, which a partner is bound to exercise, when he is the active manager and agent of the concern, and especially, where he is the only one so relied upon to look after its interests, and that of a mere silent partner, who lends his name and capital, or credit, and who is not expected to devote any time to the management of the concern, and who may, consistently enough, in some particular transaction with the partnership, have an antagonist interest, if this is known, at the time to the agent, and is open to the knowledge of the other partners.

2. Matters of fraud, or unfaithfulness, or want of good faith, not dependent upon specific evidence, but which are to be inferred, from the general course and results of a protracted and complicated business, when once determined by the triers, are not commonly expected to be unsettled by the court, except upon the most satisfactory grounds.

3. The loss on the rag-machine, at $850, and the carding machine, $560, made by Daniels & Co., for the rag-wool concern, enormous as it was, must fall we think, upon the makers, as they do not appear ever to have been delivered to the other firm. From Daniels and Stearns being partners in both firms, and the number of partners the same in both, it would seem to have been much a matter of indifference to them, upon which firm, the loss did fall.

4. As to the orators' charge, for attending suits of the firm of R. Daniels & Co., without any employment by them, except what is inferable from his being a partner, and necessarily interested, in the result, we think it very obvious, he cannot charge the Company. Some of his own complaints, that the Company did not employ

him professionally, when it would be for their interest to have done so, would seem to imply, that at that time, he did not consider, that a retainer, by himself, was sufficient.

Decree of Chancellor reversed and cause remanded to Court of Chancery.